IN THE UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| | Criminal No. 17-335 |
| v. | |
| AZAD KHIZGILOV | |

## DEFENDANT AZAD KHIZGILOV'S
## REPLY MEMORANDUM IN AID OF SENTENCING

    The defense respectfully submits this memorandum on behalf of defendant Azad Khizgilov to briefly reply to the Government's September 20, 2021 response to his sentencing memorandum. Stripped of emotional hyperbole, the Government's arguments hinge upon unsupported assumptions and hypotheticals not grounded in reality. Moreover, it places undue emphasis on summarily lumping defendants together while wholly ignoring many germane sentencing factors under Section 3553(a) that meaningfully differentiate them.

    At the outset, the Government speciously claims that "[t]here is no appreciable difference between these defendants [including Mr. Khizgilov] and [Garri] Shihman." [Govt Response, p.1]. However, that myopic view overlooks a significant appreciable difference. Shihman processed transactions for items he knew to be controlled substances. In stark contrast, Mr. Khizgilov (and, for that matter, Messrs. Shaulov and Abrams) knowingly sought to avoid doing so, which is why Mr. Khizgilov purposely separated from Shihman. In fact, the foregoing is corroborated by the Government's own documentation submitted to this Court. Specifically, attached to the Government's sentencing response (as Exhibits 4-9) are memorialized employee interviews which confirm that Mr. Khizgilov, as well as Messrs. Shaulov and Abrams, told them contemporaneously during the offense conduct "that they were trying to avoid selling controlled substances." [Govt Response, p.3, n.2].

    Next, the Government attacks the defense's position concerning the loss amount overstating the seriousness of the offense with three arguments. First, it states "the defendants agreed to the loss amount in their plea agreements." [Govt Response, p.3]. While that statement is correct, it bears emphasis that the defendants did not agree that such loss amount accurately reflects the seriousness of the offense. And that is because it does not.

    Second, the Government asserts that, by its estimation, "these defendants processed more than $50 million in fraudulent credit card transactions." [Govt Response, p.3]. But that conclusory assertion is a red-herring. To be clear, the Guidelines loss – which is the only relevant loss here – is merely a small fraction of that proffered amount. And even still, none of these numbers reflect an actual financial loss to anyone.

Third, the Government argues that "the defendants' crimes are unique." [Govt Response, p.3]. On that point, both parties agree, albeit for different reasons. The offense conduct is unique for a Section 1349 fraud offense because Mr. Khizgilov and his co-defendants took substantial steps to avoid causing any actual economic harm. Notably, in its analysis, the Government blindly ignores that fact.

Instead, the Government claims that "[t]he crimes are unique because a number of companies and individuals *could* consider themselves victims of the defendant's scam." [Govt Response, p.3] (emphasis added). Presumably, certain parties *could* potentially consider themselves such. But, based on actual evidence (and/or lack thereof), they would be wrong. Indeed, not one of such hypothetical parties sustained any actual financial harm.

Still, the Government argues that the "companies that authorized the front companies to process credit card transactions" were the primary targets because they "faced fines, chargebacks and all sorts of *potential* financial loss because of the defendant's fraudulent conduct." [Govt Response, p.3] (emphasis added). Yet again, despite the theoretical "potential" for financial loss cited by the Government, no such entities experienced any such thing in reality. While the Government simply discounts this point, the fact that there is no economic harm in a case of this nature is not by happenstance. It is because Mr. Khizgilov and his co-defendants took proactive efforts to shield others from actual economic harm.

Endeavoring to manufacture additional purported "targets," the Government goes so far as to argue that secondary targets "were the dozens of individuals who the defendants deceived into acting as owners of front companies." [Govt Response, p.3]. That position is based on the Government's statement that "most" of these individuals – upon being questioned by federal agents after knowingly participating in a fraud – self-servingly claimed "they had no idea" they were taking part in it. [Govt Response, p.3].

The defense recognizes that the Government is engaging in zealous advocacy. Still, one would have hoped that commonsense would not give way to such zeal. While certain participants may very well have minimized their involvement and knowledge of the fraud to the Government for the sake of their own penal interests, the fact remains that these individuals were fully informed and complicit. As such, they were certainly not victims or targets.

Simply put, the Government's attempt to inaccurately paint with very broad strokes should not be countenanced by the Court. While Mr. Khizgilov understands that he should be punished, the punishment should fit the actual crime, and not flights of fancy unconnected to reality.

Lastly, the Government states that the "primary" harm was to the consumers. [Govt Response, p.3]. But, in the very next sentence, it openly concedes that it does not even know the nature or extent of any such harm. Accordingly, the Government proceeds to engage in rank conjecture: "We will never know how many individuals got hooked on products like modifinil, were impacted because of steroid abuse, or became ill or even died because they took a drug" sold in a

2

credit card transaction processed during the offense. [Govt Response, p.3]. The fact that the Government would so flippantly throw around theoretical accusations of potential deaths – for which there is absolutely no evidence – is troubling by itself. Additionally, Modifinil (a sleep aid) is generally not addictive.[1] But most importantly, the Government acknowledges it "may never know" the details of what it is alleging. In other words, the Government does not know now.

Although the Government carries the burden in this proceeding, the thrust of its argument is based on hypothetical unproven assumptions by a prosecutor without any evidentiary support. And worse still, the Government seeks to use such speculation to severely punish Mr. Khizgilov, and indirectly his family. In fact, despite the many hypotheticals and assumptions in its submission, the one reality – *based on evidence* – which the Government wholly ignores is the very real collateral impact a custodial sentence would have on Mr. Khizgilov's family.

For the reasons set forth above, and in its initial memorandum, the defense respectfully requests that the Court, pursuant to the considerations set forth in Section 3553(a), sentence Mr. Khizgilov to a stringent five-year term of home detention coupled with community service.

The Court's consideration in this matter is great appreciated.

Dated: New York, New York
September 22, 2021

Respectfully submitted,

*[signature]*

Chad D. Seigel (NY 2863470)
Tacopina Seigel & DeOreo
275 Madison Avenue, 35th Floor
New York, NY 10016
(212) 227-8877
*Counsel for Defendant Azad Khizgilov*

cc:   AUSA Brendan T. Conway
      Gregory D. Wilson, U.S. Probation Officer

---

[1] "Modafinil is an unrivaled wakefulness-promoting medication and not addictive with an excellent safety profile." *Effects of Modafinil on Sleep Pattern during Methamphetamine Withdrawal: A Double-blind Randomized Controlled Trial*, Addict Health. 2019 Jul; 11(3): 165–172. *See* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6904978/.

3